STATE of Utah, Plaintiff and Appellee,

v.

Gertrude CROSBY, Defendant
and Appellant.

No. 950453.

Supreme Court of Utah.

Oct. 29, 1996.

Jan Graham, Atty. Gen., Todd A. Utzinger, Asst. Atty. Gen., Ernest W. Jones, Salt Lake City, for plaintiff.

Candice A. Johnson, Salt Lake City, for defendant.

DURHAM, Justice:

The Utah Court of Appeals transferred this case for a determination of whether *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), states a different standard for admitting evidence pursuant to Federal Rule of Evidence 702 than we articulated for admission of evidence under Utah Rule of Evidence 702 in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), and if so, whether the *Daubert* standard should be adopted as the governing rule in Utah. Along with this certified question, this case presents three issues on appeal: (1) whether, given our determination of the certified question, the trial court properly excluded polygraph evidence under Utah Rule of Evidence 702, (2) whether the trial court properly admitted expert handwriting evidence under Utah Rule of Evidence 702, and (3) whether trial counsel rendered ineffective assistance by not object-

ing timely to the information charging defendant with three counts of theft.

## I. BACKGROUND

Defendant Gertrude Crosby was employed as a bookkeeping clerk for Sign Services. Linda Townsend, the company's owner, alleged that between November of 1991 and June of 1992, Crosby misappropriated company funds for her personal use. Prior to charging Crosby, the prosecutor requested that Crosby and Townsend submit to polygraph examinations. Both agreed, and Sergeant Steve Bartlett, a state-licensed polygraph examiner, administered the tests. After reviewing the test results, Sergeant Bartlett scored Crosby a +7, concluding that she had been truthful in denying allegations of misappropriation of company funds. He then scored Townsend a –4, stating that it was inconclusive whether she had been truthful or deceptive.[1] The State then asked a second polygraph expert, Gale McCurdy, to examine the test results. He scored Crosby a +4 and Townsend a –5, stating that he considered the results of both tests to be inconclusive.

Despite the inconclusiveness of the polygraph examinations, the State charged Crosby with three counts of theft and one count of forgery. Because the parties did not stipulate to having the polygraph results admitted into evidence at trial, Crosby moved to include expert testimony concerning the results. The trial court denied the motion, ruling (1) that polygraph tests were not sufficiently reliable, and (2) that because the test results were inconclusive, the evidence would not be helpful to the jury. Prior to trial, Crosby also moved to exclude expert testimony on handwriting, claiming that the State's expert, Detective Brent Hutchison, was not qualified to testify. The trial court denied this motion. Crosby was subsequently convicted on all four counts.

## II. ADMISSION OF SCIENTIFIC EVIDENCE UNDER UTAH RULE OF EVIDENCE 702

In *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), we interpreted Utah Rule of Evidence 702, which states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The issue in *Rimmasch* was whether our adoption of rule 702 altered the standard we established in *Phillips v. Jackson*, 615 P.2d 1228 (Utah 1980), for the admission of scientific evidence. In *Phillips*, we abandoned exclusive reliance on the "general acceptance" test of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and adopted an "inherent reliability" standard. *Phillips*, 615 P.2d at 1234. In applying this standard, a trial court should conduct "[a]n analysis of the admissibility of scientific evidence, . . . taking into account general scientific acceptance and widespread practical application, [but] must focus in all events on proof of inherent reliability." *Id.*

In *Rimmasch*, the State argued that under rule 702, all relevant expert testimony that might assist the trier of fact should be admitted and that any concerns about reliability should be left entirely to the finder of fact. 775 P.2d at 397. In rejecting this position, we noted that we had previously addressed this issue in *Kofford v. Flora*, 744 P.2d 1343 (Utah 1987), where "we made it clear that regardless of how rule 702 phrases the general test for the admissibility of expert testimony, our case law superimposes a more restrictive test whenever scientific evidence is at issue, and that a more restrictive test was set forth in *Phillips*." *Rimmasch*, 775 P.2d at 397. We then stated:

Casting the *Phillips/Kofford* standard in terms of the rubric of rule 702, it can be said that evidence not shown to be reliable cannot, as a matter of law, "assist the trier of fact to understand the evidence or to determine a fact in issue" and, therefore, is inadmissible.

*Id.* at 397–98 (quoting Utah R. Evid. 702).

Under the *Phillips* test as reiterated in *Rimmasch*, a court must conduct a

---

**1.** One of the State's polygraph experts who testified at trial indicated that a minus score indicates deception and a plus score indicates truth- fulness. A score of +6 or better is considered truthful, –6 or lower is considered deceptive, and anything in between is considered inconclusive.

three-step analysis to determine the admissibility of scientific evidence. Step one requires the court to determine whether the scientific principles and techniques underlying the expert's testimony are inherently reliable. *See Rimmasch,* 775 P.2d at 400. The court may do this by judicial notice if the scientific principles and techniques at issue have been generally recognized and accepted by the legal and scientific communities. *Id.; see also Kofford,* 744 P.2d at 1348 (holding that scientific principles and techniques underlying human leukocyte antigen (HLA) testing were accepted by legal and scientific communities for proving paternity and therefore proper grounds for judicial notice existed). If judicial notice is not appropriate, the court must determine whether the party seeking to have the evidence admitted has sufficiently demonstrated the inherent reliability of the underlying principles and techniques. *See Rimmasch,* 775 P.2d at 400.

■ If inherent reliability is demonstrated—whether by judicial notice or through a foundational showing—the court then moves to step two, which requires a determination that the scientific principles or techniques at issue have been properly applied to the facts of the particular case by sufficiently qualified experts.[2] *Id.* at 398 n. 7; *see also Kofford,* 744 P.2d at 1354, 1356. The burden is again on the party seeking admission of the scientific evidence to present a sufficient foundational showing. By the end of steps one and two, "the trial court should [have] carefully explore[d] each logical link in the chain that leads to the expert testimony given in court and determine[d] its reliability." *Rimmasch,* 775 P.2d at 403.

If the trial court determines that the scientific evidence meets the requirements of steps one and two, it must then, under step three, determine whether the proffered scientific evidence will be more probative than prejudicial as required by rule 403 of the Utah Rules of Evidence. *Rimmasch,* 775 P.2d at 398 n. 8. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Utah R. Evid. 403. We stated in *Rimmasch* that where a court finds that the relevant scientific principles and techniques are inherently reliable and that they have been properly applied to the case at hand by a qualified expert, "the dangers of unfair prejudice, confusion of the issues, misleading the jury, etc., attendant to its introduction would have to be great indeed to preclude its admission." 775 P.2d at 398 n. 8.

Four years after we decided *Rimmasch,* the United States Supreme Court issued its opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which interprets the proper standard for admitting scientific evidence under Federal Rule of Evidence 702.[3] As stated, the court of appeals certified this case for a determination of whether the United States Supreme Court's interpretation of Federal Rule of Evidence 702 in *Daubert* was different from our interpretation of Utah Rule of Evidence 702 in *Rimmasch* and, if so, which standard should apply in Utah.

We asked the parties to submit supplemental briefs addressing this issue, and each concluded that the standards are, for the most part, similar. We agree. In *Daubert,* the Supreme Court acknowledged the "liberal thrust" of rule 702 but nevertheless refused to jettison the requirement of a threshold showing of reliability for expert scientific testimony, stating that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. at 2795. The Court recognized that some scientific principles are so well-established that they

---

2. In practice, the foundational showing necessary to demonstrate the inherent reliability of a scientific principle or technique discussed in step one will overlap with the foundational showing necessary for the admission of scientific evidence in a particular case discussed in step two. We separate them, however, to emphasize the point that a foundational showing that a technique is

inherently reliable does not necessarily imply that the technique was properly applied to the facts of the case by a qualified expert.

3. Federal Rule of Evidence 702 and Utah Rule of Evidence 702 are textually identical.

are properly subject to judicial notice. *Id.* at 592 n. 11, 113 S.Ct. at 2796 n. 11. It also stated that where judicial notice is not appropriate, the proponent may make a foundational showing establishing the reliability of the expert's scientific testimony. *Id.* at 592–93, 113 S.Ct. at 2796–97. Finally, the Court stated that even if scientific evidence is shown to be reliable, its proponent must still demonstrate that the scientific techniques were properly applied in the case at hand and that the evidence is not inadmissible under Federal Rule of Evidence 403. *Id.* at 592 n. 10, 113 S.Ct. at 2796 n. 10. In short, the Supreme Court in *Daubert* suggested a three-step analysis for the admission of scientific evidence similar to the standard we established in *Rimmasch*.

If there is a noteworthy difference between the two opinions, it is perhaps that our opinion in *Rimmasch* provides a detailed and rigorous outline for trial courts to follow when making determinations concerning the admissibility of scientific evidence. *Rimmasch*, 775 P.2d at 403 ("[T]he trial court should carefully explore each logical link in the chain that leads to expert testimony given in court and determine its reliability."). The Supreme Court in *Daubert*, on the other hand, emphasized a more flexible approach to the admission of scientific evidence and did not "presume to set out a definitive checklist or test," instead providing only "general observations" about how a trial court should evaluate the reliability of evidence proffered under rule 702. 509 U.S. at 593–95, 113 S.Ct. at 2796–98.

*Rimmasch* was decided four years prior to *Daubert* and has proven to be effective in guiding trial courts in determining the admissibility of scientific evidence. In addition, our interpretation of Utah Rule of Evidence 702 in *Rimmasch* was based, in part, on Utah case law which "superimposes a more restrictive test whenever scientific evidence is at issue." 775 P.2d at 397. Accordingly, we hold that *Rimmasch* sets forth the proper standard for admitting scientific evidence under Utah Rule of Evidence 702.

## III. POLYGRAPH EVIDENCE

We now address Crosby's claim that the trial court incorrectly denied her motion to admit expert testimony concerning the results of the polygraph examinations given to her and Townsend. A trial court has considerable discretion in determining whether expert testimony is admissible. *See Wessel v. Erickson Landscaping Co.,* 711 P.2d 250, 253 (Utah 1985).

We last addressed the admissibility of polygraph evidence in *State v. Eldredge,* 773 P.2d 29 (Utah 1989). In that case, we held that absent a stipulation between the parties, polygraph evidence was inadmissible to bolster a defendant's claim of innocence. We stated:

> The reason for this rule is that polygraph data has not been shown to be sufficiently reliable to justify the tendency of a fact finder to be overawed by the test results and too willing to abdicate its difficult truth finding function to an expert and his or her machine.

*Id.* at 37. Given this holding, the question now before us is whether Crosby, as the proponent of the scientific evidence, has made a sufficient foundational showing demonstrating advancements in polygraph examination technology in the years since *Eldredge* such that polygraph evidence now meets the inherent reliability test of *Rimmasch*.

We note initially that Crosby did not ask the trial court to take judicial notice of the inherent reliability of polygraph evidence, nor would it be appropriate for a court to do so. Unlike the HLA test evidence in *Kofford,* of which we took judicial notice, polygraph evidence is not generally accepted in the legal or scientific community. In fact, every court that has examined this issue, save one, has held that polygraph evidence is either inadmissible per se[4] or admissible only in cases where the parties have waived

---

4. *See, e.g., Pulakis v. State,* 476 P.2d 474 (Alaska 1970); *People v. Anderson,* 637 P.2d 354 (Colo. 1981); *People v. Baynes,* 88 Ill.2d 225, 58 Ill.Dec. 819, 430 N.E.2d 1070 (1981); *Kelley v. State,* 288 Md. 298, 418 A.2d 217 (1980); *State v. Mitchell,* 402 A.2d 479 (Me.1979); *State v. Biddle,* 599 S.W.2d 182 (Mo.1980); *State v. Steinmark,* 195 Neb. 545, 239 N.W.2d 495 (1976); *State v. Frazier,* 162 W.Va. 602, 252 S.E.2d 39 (1979); *State v. Dean,* 103 Wis.2d 228, 307 N.W.2d 628 (1981).

reliability concerns by stipulating to the evidence's admission.[5] Courts refusing to admit polygraph evidence generally cite three reasons: (1) the scientific community's disagreement over its reliability, (2) the lack of any standardized testing procedures, and (3) the risk that the finder of fact will give it undue weight. *See United States v. Piccinonna*, 885 F.2d 1529, 1532 (11th Cir.1989) (examining grounds upon which various courts have relied to exclude polygraph evidence).

Because judicial notice was not appropriate in this case, the trial court conducted an evidentiary hearing to consider the admissibility of the polygraph evidence. At the hearing, Crosby called two witnesses—Steve Bartlett, the polygraph examiner who conducted the examinations in this case, and Gale McCurdy, the polygraph examiner the State asked to review the results of Bartlett's testing. During the hearing, the trial court asked McCurdy the pivotal question in this case: "Well, can you think of anything of a significant nature—anything, say, in the last four or five years since 1989 [the year we decided *Eldredge* ], that you can point to and tell me, this is a breakthrough in this area?" McCurdy cited recent studies by "Dr. Raskin and various others" indicating that the accuracy rate for certain polygraph examinations was "90 percent plus." Bartlett, in response to a similar question, could cite only one recent study which he stated demonstrated an accuracy rate for polygraph testing "around 98 to 99 percent." Neither McCurdy nor Bartlett explained the scientific principles behind the recent studies or suggested that the studies were considered valid by other experts in the field. In fact, at one point in the hearing, McCurdy acknowledged that many experts continue to question the reliability of polygraph evidence, some arguing that it is so unreliable that it should never be used in court.

Given the paucity of information in the record before us, we cannot say that the trial court abused its discretion in refusing to admit the polygraph results. While we would be willing to reexamine this issue, we note that a future proponent of polygraph evidence should make a detailed foundational showing, specifically demonstrating how research or recent developments in the field have made polygraph evidence more reliable. The record in this case fails to meet this burden.[6]

## IV. HANDWRITING EVIDENCE

We next consider Crosby's claim that the trial court incorrectly denied her motion to exclude expert testimony concerning handwriting evidence. In a pretrial hearing on this motion, Crosby argued that the State's handwriting expert, Detective Brent Hutchison, was not sufficiently qualified to render an opinion in this case. In making this argument, Crosby's trial counsel initially questioned Detective Hutchison concerning his background and training as a forensic documents examiner. Her trial counsel then questioned George Throckmorton, a certified expert in the field of forensic document examination who subsequently testified on her behalf at trial. Throckmorton indicated that in his opinion, Detective Hutchison lacked the necessary qualifications to be nationally certified in the field. Following the hearing, the trial court denied the motion, stating that Detective Hutchison had "sufficient training and experience to testify in this matter on the subject of handwriting."

On appeal, Crosby disputes the trial court's determination that Detective Hutchison was qualified to render expert testimony on handwriting evidence. In addition, she argues that under either the ineffective assistance of counsel or the plain error doctrine,

5. *See, e.g., Codie v. State,* 313 So.2d 754 (Fla. 1975); *Pavone v. State,* 273 Ind. 162, 402 N.E.2d 976 (1980); *State v. Marti,* 290 N.W.2d 570 (Iowa 1980); *State v. Roach,* 223 Kan. 732, 576 P.2d 1082 (1978); *State v. Souel,* 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978); *Cullin v. State,* 565 P.2d 445 (Wyo.1977). Only New Mexico allows the admission of polygraph evidence in the absence of a stipulation. *State v. Dorsey,* 88 N.M. 184, 539 P.2d 204 (1975).

6. In her brief, Crosby disputes the trial court's second ground for barring the polygraph evidence—that the test results were inconclusive and therefore not relevant to the trier of fact. Because we agree with the trial court's first ground for refusing to admit the evidence, we do not address this issue.

we should review all aspects of the admissibility of handwriting evidence, including whether the evidence is inherently reliable. Crosby invokes these doctrines on appeal because her trial counsel failed to question the inherent reliability of handwriting evidence either before or during the trial.[7]

▊ We first address Crosby's claim of ineffective assistance of counsel. To prevail on this claim, she must show (1) that her trial counsel's performance was objectively deficient, and (2) that there exists a reasonable probability that absent the deficient conduct, she would have obtained a more favorable outcome at trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Smith,* 909 P.2d 236, 243 (Utah 1995); *State v. Templin,* 805 P.2d 182, 186 (Utah 1990). To demonstrate objectively deficient performance under the first part of the test, Crosby must overcome a strong presumption that her trial counsel rendered adequate assistance. *Taylor v. Warden,* 905 P.2d 277, 282 (Utah 1995). In addition, we give trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them. *Id.*

▊ Applying these presumptions to the instant case, we find no reason to question trial counsel's decision not to raise the issue of the inherent reliability of handwriting evidence. Trial counsel planned, as a key component of Crosby's case, to call a handwriting expert to dispute the State's charges. Indeed, at trial Crosby's expert stated that in his opinion most of the documents in question were not forgeries. He further testified that even though one of the documents appeared to be a simulated forgery, it was impossible to determine who had committed the forgery. This was strong evidence in favor of Crosby. Thus, we cannot say that trial counsel's tactical decision to place expert handwriting testimony before the jury

instead of challenging its inherent reliability was ineffective assistance of counsel.

▊ This same rationale applies to Crosby's claim of plain error. Under this doctrine, an appellate court may review a trial court ruling to which the defendant failed to object below. *State v. Eldredge,* 773 P.2d 29, 35–36 (Utah 1989). We have stated, however, that consistent with the policy underlying the doctrine, "if a party through counsel has made a conscious decision to refrain from objecting or has led the trial court into error, we will then decline to save that party from the error." *State v. Bullock,* 791 P.2d 155, 158 (Utah 1989); *see also State v. Emmett,* 839 P.2d 781, 785 (Utah 1992); *Morgan v. Quailbrook Condominium Co.,* 704 P.2d 573, 579 (Utah 1985). *State v. Medina,* 738 P.2d 1021 (Utah 1987), is instructive. There, the defendant attempted to use the plain error exception found in Utah Rule of Criminal Procedure 19(c) to challenge an instruction given to the jury. This court, however, refused to apply the exception, stating that the defendant's trial counsel had affirmatively represented to the trial court that she had read the instruction and had no objection to it. *Id.* at 1023. The court continued, "Although in retrospect [trial counsel's] decision may appear to have been ill-advised, the fact remains that counsel chose not to assert any objection that might have been raised and affirmatively led the trial court to believe that there was nothing wrong with the instruction." *Id.*

In the case at bar, Crosby's trial counsel not only failed to object to the inherent reliability of handwriting evidence, but took the affirmative step of placing evidence before the trial court demonstrating the evidence's inherent reliability. Allowing Crosby to dispute on appeal the inherent reliability of the very evidence she relied on at trial would contradict the central purpose of the plain error doctrine, which is to avoid "manifest injustice." *See Bullock,* 791 P.2d at 158.

---

7. In her motion to exclude expert testimony, Crosby requested a hearing to challenge Detective Hutchison's qualifications and also "the admissibility of [his] anticipated testimony." The hearing, however, focused entirely on Detective Hutchison's qualifications; the inherent reliability of handwriting evidence was never questioned. To the contrary, Crosby's trial counsel called its own expert, who explained in detail the scientific principles and research supporting the validity of handwriting evidence.

Accordingly, we refuse to apply the plain error doctrine in this case.

■ We now turn to Crosby's claim that the trial court incorrectly held that Detective Hutchison was sufficiently qualified to testify as an expert on handwriting evidence. We have repeatedly held that trial courts "are to be given a wide measure of discretion in determining whether a particular witness qualifies as an expert." *Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.*, 909 P.2d 225, 233 (Utah 1995); *see also State v. Espinoza*, 723 P.2d 420, 421 (Utah 1986).

■ Upon reviewing the record, it is apparent that while Detective Hutchison was perhaps not as experienced as Crosby's handwriting expert, a point Crosby repeatedly made both at the hearing on her motion and in her brief to this court, he nevertheless did have substantial experience and training in the field of forensic document examination. At the hearing, Hutchison testified that in 1990 he attended a two-week course on handwriting analysis and questioned documents at the Secret Service Training Center in Glencoe, Georgia. He also testified that in 1993 he attended a fourteen-week course conducted by J.D. Burgen, a nationally recognized expert on handwriting analysis. At the time of trial, Detective Hutchison had specialized in the area of check fraud, forgery, and credit card fraud for approximately five years and was devoting approximately fifty percent of his time as a detective to the examination of questioned documents. He is also a charter member of the Intermountain Document Examiners Association, a group of law enforcement officers and other handwriting experts which meets regularly to review cases of document examinations and which provides specialized training for its members. Given Detective Hutchison's qualifications as outlined in the record, the trial court did not abuse its discretion in allowing him to testify as an expert in this case.

## V. CONSOLIDATION OF THEFT COUNTS

■ The final issue we must address is whether Crosby's trial counsel rendered ineffective assistance by not timely objecting to the information in which Crosby was charged with three counts of theft instead of one count. As stated, to prevail on a claim of ineffective assistance of counsel, Crosby must demonstrate that her trial counsel's performance was objectively deficient and that in the absence of this deficient performance, she would have obtained a more favorable outcome at trial. The State concedes that Crosby has met this burden, and we agree.

In *State v. Kimbel*, 620 P.2d 515, 518 (Utah 1980), this court held that "embezzlement over a period of time may be found to constitute one continuous transaction" and therefore one offense. The court also stated:

> "[T]he general test as to whether there are separate offenses or one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. The particular facts and circumstances of each case determine this question. If there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense."

*Id.* (quoting *People v. Howes*, 99 Cal.App.2d 808, 222 P.2d 969 (1950)); *see also State v. Patterson*, 700 P.2d 1104 (Utah 1985) (acts of embezzlement over two-month span charged as single offense). Section 76–1–402 of the Utah Code supports this holding, stating that "when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision." Utah Code Ann. § 76–1–402(1) (1995).

■ The evidence in this case demonstrates that although the transactions underlying Crosby's theft convictions occurred over a period of time, they were part of a single plan and should have been charged as a single offense. In fact, the information charging Crosby with three counts of theft and the instructions given to the jury at the conclusion of the case made no distinction between the three counts. The State concedes in its brief that the transactions were separated into different counts to distinguish the different methods Crosby used to alleg-

edly divert cash for her personal use and that while this may have been a logical way to present evidence to the jury, Crosby should have been charged with only one count of second degree theft.

Crosby's trial counsel also recognized that the three theft counts should have been consolidated into a single count but failed to raise the issue during trial, instead filing a motion to arrest judgment or, in the alternative, to consolidate the convictions. In addition to being untimely, *see State v. Lairby,* 699 P.2d 1187, 1192 (Utah 1984) (objection to information that is not made either before or during trial is deemed waived), *overruled in part on other grounds by State v. Ossana,* 739 P.2d 628, 631 n. 8 (Utah 1987), this motion did not cite *Kimbel* or any other case law. The trial court denied the motion.

Given the facts of this case and clear Utah case law on this issue, it was error for the trial court to deny the motion, although counsel bears responsibility for failing to bring the matter promptly to the court's attention and to cite applicable law. Nonetheless, on the basis of the State's concession on appeal, the convictions should be consolidated and the judgment amended.

## VI. CONCLUSION

Our opinion in *State v. Rimmasch* sets forth the proper standard for admitting scientific evidence under Utah Rule of Evidence 702. Applying this standard, we affirm the trial court's decision excluding polygraph evidence. We also affirm the trial court's determination that Detective Hutchison was qualified to testify as an expert on the subject of handwriting evidence. However, because we conclude that it was error to permit conviction of three separate theft counts, we remand the case to the trial court and order that Crosby's three second degree felony theft convictions be consolidated into one second degree felony conviction and the judgment of conviction be amended accordingly.

ZIMMERMAN, C.J., HOWE and RUSSON, JJ., and DAWSON, Judge, concur in Justice DURHAM'S opinion.

Having disqualified himself, Associate Chief Justice STEWART does not partici-

pate herein; District Judge GLEN R. DAWSON sat.